IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HOMAX PRODUCTS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-125-SLR |
| | ) |
| OLD MAGIC CORPORATION f/k/a | ) |
| Magic American Corporation f/k/a | ) |
| Magic American Chemical Corporation, | ) |
| and ALSCOTT, LLC f/k/a Scottal, LLC, | ) |
| and ACME PATENT CORP. f/k/a | ) |
| Pentagonal Holdings, Inc., and | ) |
| ALAN F. ZEILINGER and SCOTT E. | ) |
| ZEILINGER, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM**

At Wilmington this 28th day of July, 2014, having reviewed the papers submitted in connection with defendants' motion to dismiss, I will grant the motion based on the following analysis:

1. **Introduction.** Plaintiff Homax Products, Inc. ("Homax") is a successor by merger to Magic American Products, Inc. ("MAP"). Homax is a Delaware corporation with its principal place of business at 1835 Barkley Boulevard, Suite 101, Bellingham, Washington. (D.I. 1 at ¶ 1) Homax is a leading supplier of do-it-yourself and professional home improvement products. (*Id.*) Defendant Old Magic Corporation ("Old Magic") (f/k/a Magic American Corporation ("MAC"), f/k/a Magic American

Chemical Corporation ("MACC"),[1] was an Ohio corporation with its principal office located in Pepper Pike, Ohio. (*Id.* at ¶ 2) Old Magic filed a Certificate of Dissolution by Shareholders, Directors, or Incorporators in the Office of the Ohio Secretary of State on or about June 24, 2004. (*Id.*) Defendant Alscott, LLC ("Alscott") (f/k/a Scottal, LLC ("Scottal")) was an Ohio limited liability company that filed a Certificate of Dissolution of Limited Liability Company (the "Alscott Certificate") in the Office of the Ohio Secretary of State on or about March 2, 2005. According to the Alscott Certificate, the company may be reached for purposes of process, notice, or demand at 27950 Belgrave Road, Pepper Pike, Ohio. (*Id.* at ¶ 3) Defendant Acme Patent Corp. ("Acme") (f/k/a Pentagonal Holdings, Inc. ("Pentagonal")) was an Ohio corporation with its principal office located in Pepper Pike, Ohio. Acme filed a Certificate of Dissolution by Shareholders, Directors, or Incorporators in the Office of the Ohio Secretary of State on or about March 21, 2005. (*Id.* at ¶ 4) Defendant Alan F. Zeilinger is an individual residing in Chagrin Falls, Ohio. (*Id.* at ¶ 5) Defendant Scott E. Zeilinger is an individual also residing in Pepper Pike, Ohio.[2] (*Id.* at ¶ 6) This court has jurisdiction over the subject matter of the litigation pursuant to 28 U.S.C. § 1332.

2. **Background.** On August 9, 2002, MAP entered into an asset purchase agreement ("APA") with MAC, Scottal, and Pentagonal, together with Alan and Scott

---

[1]As explained in the papers, MACC is the former name of the corporation that subsequently became known as MAC and then finally known as Old Magic before it was dissolved. When in existence, the principals of MAC were Alan and Scott Zeilinger (collectively, the "Zeilingers"). (D.I. 15 at 4)

[2]Hereinafter, defendants Old Magic, Alscott, Acme, and Alan and Scott Zeilinger may be referred to collectively as "defendants."

2

Zeilinger as stockholders. (*Id.* at ¶ 17) Homax is successor in interest to MAP, while Old Magic is successor in interest to MAC.[3]

3. On October 17, 2012, Ernest C. Reed ("Reed") filed a complaint in the Superior Court of the State of Rhode Island and Providence Plantations, Providence County, *Reed v. A.I.I. Acquisitions, LLC, et al.*, Civ. No.12-5404 (the "*Reed* Action"), alleging asbestos-related injuries against more than one hundred defendants, including MACC. (*Id.* at ¶¶ 11, 12; ex. 2) In his complaint, Reed alleges that he contracted asbestos-related mesothelioma and other asbestos-related pathologies as a result of exposure to, and inhalation of, asbestos. Reed further alleges that MACC and other defendants, *inter alia*, "engaged in the business of contracting for, mining, milling, processing, distributing, delivering, marking, and/or selling asbestos and asbestos products." (*Id.* at ¶ 13) It is further alleged in the *Reed* Action that MACC and other defendants sold asbestos-containing products "to the employer(s) of the Plaintiff, or to others working at the various job sites where the Plaintiff was employed, or to third persons who, in turn, delivered and sold such products and materials to employers or to others working at such job sites for use by employees, including the Plaintiff, or others through which the Plaintiff was exposed." (*Id.* at ¶ 14) Reed claims that the asbestos products were defective, resulting in Reed contracting severe, painful, and fatal injuries, and causing "great pain, suffering, mental anxiety, distress of mind, humiliation, emotional trauma and mental anguish." (*Id.* at ¶ 15) In his complaint, Reed seeks at least $1,000,000 in compensatory damages, $1,000,000 in punitive damages, and

---

[3]After the sale of assets to MAP, MAC changed its name to Old Magic and, as noted, dissolved. (D.I. 15 at 4)

exemplary damages, including attorney fees, interest, and costs, with respect to claims for: (i) failure to warn; (ii) negligence; (iii) strict product liability; (iv) breach of warranty; and (v) conspiracy. (*Id.* at ¶ 16)

4. Although the summons in the *Reed* Action was directed to "Magic American Chemical Corporation," it was addressed to "The Homax Group, Inc., P.O. Box 5643, Bellingham, WA 98227." (*Id.* at ¶ 12; ex. 2 at 2) The summons gave 20 days after service to answer the complaint. (*Id.*) On or about November 13, 2012, Homax sent correspondence to "S. Zeilinger" by messenger. (*Id.*, ex. 3) In the correspondence, Homax alleged that "MAP" (as opposed to MACC) was named as a defendant in the *Reed* Action and sought indemnification and defense from defendants pursuant to Section 11.1(a)(v) of the APA. (*Id.*, ex. 3) Homax also requested that defendants respond to the correspondence within the ten-day period set forth by Section 11.1(c) of the APA. (*Id.*) There was no timely response to the November 13, 2012 correspondence. On December 14, 2012, Homax filed an answer to the *Reed* complaint. (D.I. 15, ex. C) On or about December 27, 2012, Homax sent defendants a second correspondence. (D.I. 1, ex. 4) In addition to substantially restating the first correspondence, the second letter stated: "You did not respond to the November 13, 2012 notice during the 10-day Election Period under Section 11.1(c)(ii) of the APA or at all. Consequently, we will proceed in accordance with Section 11.1(c)(iv) of the APA on the understanding that your silence means that we are to handle Homax's defense in the above-referenced lawsuit and the reasonable costs thereof will be borne by you in full." (*Id.*)

4

5. Counsel representing the Zeilingers responded to Homax in a letter dated January 11, 2013. (D.I. 15, ex. A) In the letter, the Zeilingers asserted that the notice provided by Homax was deficient under the terms of the APA. After noting the dissolution of MACC, the Zeilingers also posed a number of questions, including "Why, and upon whose authority, was an Answer filed on behalf of Magic American Chemical Corporation?" and "Why, and upon whose authority, did the Answer not include a defense of insufficiency of service of process." (Id., ex. A at 3) Homax was directed to "refrain from taking any further action in the [Reed] matter." (Id., ex. A at 4)[4]

6. On January, 22, 2013, Homax commenced this action against defendants with four claims for relief. The first is contractual indemnification: "Homax requests that the Court enter judgment declaring that Defendants are obligated, jointly and severally, to indemnify and hold Homax harmless and that Homax is entitled to recover all of its attorneys' fees and costs incurred (or to be incurred) in connection with the Reed Action and all expenses or other amounts incurred (or to be incurred) arising out of the Reed Action." (D.I. 1 at ¶ 33) The other claims for relief are for breach of the APA, and declaratory judgments for indemnification and payment of all legal fees and costs that Homax incurred in defending the Reed Action. (Id. at ¶¶ 34-52) Pending before the court is defendants' motion to dismiss for failure to state a claim. (D.I. 14)

7. **Standard of review.** A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v.*

---

[4]Counsel for defendants thereafter undertook the defense of MACC in the *Reed* Action, obtaining a voluntary stipulation of dismissal of MACC on April 4, 2013 which was filed in court on April 5, 2013. (D.I. 15, ex. B)

5

*Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

6

8. The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

9. **Standing.** In their motion to dismiss, defendants argue that Homax lacks standing to pursue its claims under the APA. Per the terms of the APA, Ohio law governs this dispute. (D.I. 1, ex. 1 at 52, Section 12.4) Under Ohio law, standing is a jurisdictional requirement: "It is an elementary concept of law that a party lacks standing to invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the subject matter of the action." *Federal Home Loan Mortg. Corp. v. Schwartzwald*, 979 N.E.2d 1214, 1218 (Ohio 2012). In order to determine whether a party has standing to sue, two determinations must be made: (1) whether the party has a sufficient stake in the outcome of an action; and (2) whether a justiciable controversy exists. *See Wilson Bennett, Inc. v. Greater Cleveland Reg'l Transit Auth.*, 588 N.E.2d 920, 924 (Ohio App. 1990).

10. In this case, both questions are informed by a review of the APA. Under Ohio law, contract interpretation is a question of law for determination by the court.

7

*Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008); *Saunders v. Mortensen,* 801 N.E.2d 452, 454 (Ohio 2004). Ohio courts examine contracts in order to determine the intent of the parties, which is presumed to reside in the language of the agreement. *Savedoff,* 524 F.3d at 763. The court must apply the plain language of the contract unless that language is ambiguous. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.,* 678 N.E.2d 519, 526 (Ohio 1997) (quoting *Alexander v. Buckeye Pipe Line Co.,* 374 N.E.2d 146, 150 (Ohio 1978), superseded by statute on other grounds); *Textileather Corp. v. GenCorp Inc.,* 697 F.3d 378, 382 (6th Cir. 2012).

11. "'[B]reach,' as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence." *Nat'l City Bank of Cleveland v. Erskine & Sons,* 110 N.E.2d 598, 603 (Ohio 1953). To prove a breach of contract, a plaintiff must establish (i) the existence and terms of a contract, (ii) the plaintiff's performance of the contract, (iii) the defendant's breach of the contract, and (iv) damage or loss to the plaintiff. *Doner v. Snapp,* 649 N.E.2d 42, 44 (Ohio App. 1994).

12. **Discussion.** The court starts with the proposition that "'[i]ndemnification' is merely a tool for allocating costs between contracting parties," as it "arises from contract, either express or implied, and is the right of a person who has been compelled

8

to pay what another should have paid to require complete reimbursement." *Battelle Memorial Institute v. Nowsco Pipeline Services, Inc.*, 56 F. Supp. 2d 944, 950-51 (S.D. Ohio 1999) (citing to *Travelers Indemnity Co. v. Trowbridge*, 321 N.E.2d 787, 789 (Ohio 1975)). The relevant contractual provisions relevant to the dispute at bar include the following sections of the APA:

> 11.1 **Indemnification**.
>
> (a) Subject to the limitations hereinafter set forth in this Section 11.1, from and after the Closing, the Sellers shall, jointly and severally, protect, defend, hold harmless and indemnify the Buyer, its officers, directors, stockholders, employees and agents, and their respective heirs, personal representatives, successors and assigns from, against and in respect of any and all losses, liabilities, deficiencies, penalties, fines, costs, damages and expenses whatsoever (including without limitation, reasonable professional fees and costs of investigation, litigation, settlement and judgment and interest) (collectively, the "Losses") that may be suffered or incurred by any of them arising from or by reason of any of the following:
>
> (i) any breach of any representation or warranty made by the Sellers in . . . Section 6.20 . . .;
>
> * * * * * *
>
> (v) . . . any liability relating to product liability claims for the use of goods or products sold by any of the Companies on or prior to the Closing Date which causes or caused, allegedly causes or caused or have caused personal injury or property damage taking place with respect to all injured persons and damaged property on or prior to the Closing Date; . . . .

(D.I. 1, ex. 1 at 42-43)

13. Article VI of the APA is directed to the representations and warranties of the Sellers, including those relating to "Environmental, Health and Safety Matters"

9

contained in Section 6.20. The only such representation that seems relevant to the instant dispute is that provided in Section 6.20 (f):

> (f) The Beachwood Facility (i) has no friable asbestos or asbestos-containing material on or in such property; (ii) has never had any asbestos-containing product manufactured at such property; and (iii) materially complies with environmental, health and safety laws relating to ambient air exposures to asbestos and other materials.

(*Id.* at 30)

14. The APA is unambiguous in its description of the indemnification obligations incurred by the Sellers. In the first instance, and with respect to the intent of the parties as expressed in the APA, the indemnification provision is limited to product liability claims "for the use of goods or products **sold by any of the Companies** on or prior to the Closing Date." (*Id.* at 43) (emphasis added) The term "Companies" is a defined term in Section 1.1(y) of the APA, having "the meaning set forth in the Preamble," that is, MAC, Scottal, and Pentagonal. (*Id.* at 1-2) This language does not sweep within its scope products sold by the predecessors to the Companies.[5]

15. The "Indemnification Procedures" of Section 11.1(c)(i) further confirm that indemnification is applicable only when claims are asserted against the "Indemnified Party." More specifically, Section 11.1(c)(i) of the APA requires that "[a] party claiming indemnification under this Agreement (an 'Indemnified Party') shall promptly (i) notify the party from whom indemnification is sought . . . of any third-party claim or **claims . . . asserted against the Indemnified Party** which could give rise to a right of

---

[5]The definition of "Sellers" is likewise specifically limited to the meaning provided in Section 1.1(ttt) of the APA, that is, MAC, Scottal, Pentagonal, and the Zeilingers. (D.I. 1, ex. 1 at 1, 5)

10

indemnification under this Agreement . . . ." (*Id.* at 44) (emphasis added) Neither MAP nor Homax were named as defendants in the *Reed* Action and, because MAP only purchased the assets of "the Companies" (as opposed to merging with any of the Sellers), neither MAP nor Homax are successors in interest to any of the Sellers or their predecessors.

16. The above conclusion is consistent with both the position of the parties[6] and the language of the APA. According to Section 2.2, "upon the transfer of the Purchased Assets on the Closing Date," MAC only assumed certain enumerated "liabilities and obligations of the Companies (the 'Assumed Liabilities')," to wit:

> (a) accrued current liabilities . . . and accounts payable relating to the Business, to the extent, and only to the extent, of the dollar amount reflected as a liability or reserve on the Closing Date Balance Sheet; and (b) all liabilities and obligations of each of the Companies arising after the Closing Date under any contract, lease or other agreement assigned to the Buyer

under the APA. (D.I. 1, ex. 1 at 8) Under both Ohio and Delaware law,

> a corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Crosset Co., Inc. v. Conrad*, 721 N.E.2d 986, 993 (Ohio 2000) (citing *Welco Industries, Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1133 (Ohio 1993)). *Accord Stayton v. Clariant Corp.*, 2013 WL 5783814, at *4 (Del. Super. August 13, 2013). None of the above

---

[6]There apparently is no dispute among the parties that "the asserted claims in the *Reed* Action are not Homax's liabilities under the APA." (D.I. 21 at 6, n.1; D.I. 22 at 1-2)

11

exceptions apply to the facts at bar. Because Homax could not be held liable for MACC's allegedly tortious acts, it had no stake in the *Reed* Action. Under these circumstances, Homax lacks standing to pursue its claims for indemnification and breach of contract under the APA.

17. Given that Homax never had a stake in the outcome of the *Reed* Action, there likewise is no justiciable controversy. The dismissal of the *Reed* Action as to MACC only serves to highlight the fact that no injury exists to be redressed by a decision favorable to Homax. Therefore, dismissal of the claims for declaratory judgment is warranted.

18. **Conclusion.** The plain language of the APA demonstrates that the claims asserted against MACC in the *Reed* Action were not claims to which the indemnification provisions of the APA applied. Homax, therefore, lacks standing to pursue its various claims under the APA, seeking reimbursement for attorney fees and costs that were voluntarily incurred by Homax without any legal basis. An appropriate order shall issue.

_____
United States District Judge